### 10271

### STURGIS v. CITY OF ROCK HILL.
#### (Four Cases.)

#### (100 S. E. 163.)

1. MUNICIPAL CORPORATIONS—EVIDENCE INSUFFICIENT TO SHOW POLLUTION OF WATERCOURSE.—Evidence in action for damages *held* to sustain finding that there was no additional pollution by defendant city's sewerage purification plant of the stream flowing through plaintiff's lands.

2. MUNICIPAL CORPORATIONS—WHEN PURIFICATION PLANT DECREASED NOXIOUS ODORS FROM STREAM.—Evidence in action for damages *held* to show that defendant city's sewerage purification plant, by purification of a stream nearer plaintiff's land than the plant, decreased, rather than increased, foul smells and noxious odors.

Before MEMMINGER, J., York, Fall term, 1918. Affirmed.

Separate actions by E. W. Sturgis, by W. T. Sturgis, by B. M. Sturgis, and by W. V. Sturgis against the city of Rock Hill. Judgment for defendant, and plaintiffs appeal.

The report of Special Referee John R. Hart is as follows: "All of the above actions are similiar in their natures. The respective plaintiffs ask damages against the city of Rock Hill, alleging that by reason of the city emptying its sewage at a point just above the lands of plaintiffs, and into a stream which flows through the lands of plaintiffs, the said

stream has been polluted and made unfit for use, and that by reason of the construction and maintenance by the city of Rock Hill of a disposal plant near the lands of the plaintiffs, which disposal plant gives off such foul and noxious odors that it has rendered the homes of the plaintiffs undesirable and unfit to live in, with consequent damages to the respective plaintiffs and in the sums as respectively set out in the complaints.

The defendant, the City of Rock Hill, answers with a general denial, and pleads further that whatever compensation plaintiffs may be entitled to may only be awarded to plaintiffs by a board of arbitrators, pursuant to the terms of the statute, and, therefore, denies the jurisdiction of this Court.

By consent, the issues of law and fact were referred to me as a special referee.

As I understand the law as laid down in *Parish v. The Town of York,* 106 S. C. 23, 90 S. E. 185, the only question that is before me, and the only question for me to decide is : Have the plaintiffs shown damage to themselves at the hands of the defendant? I have nothing to do with the *quantum* of the damages, and it is with this view of the law that I frame my report.

As previously stated, the plaintiffs contend that they are damaged from two sources—namely, pollution of the stream and the creation of foul and noxious odors rendering their homes uninhabitable.

To reach a decision on these two questions of fact has caused me much trouble and considerable time. The class of testimony offered has been unusually high. Both plaintiffs and defendant have presented witnesses whose integrity and veracity could not be impeached, yet whose testimony is in apparent conflict, the one with the other.

Taking up first the question of the pollution of the stream : The plaintiff, B. M. Sturgis, in response to the question as to how this stream was affected by the erection of this septic tank, answered that in one way it was affected by the odors arising therefrom. He also states that he had never used

this land for a pasture.   He also stated that the Carhartts
were putting dye-stuff into the branch prior to the erection
of the septic tank.   This last fact seems to have been estab-
lished beyond question by other testimony to which I will
allude later.   The witness did state that the sediment found
in the stream was not so thick prior to the intallation of the
septic tank.

Mr. W. V. Sturgis, another plaintiff, stated that he did
not use the water from the stream, but that a colored man
on the place used it.

Another plaintiff, Mr. F. W. Sturgis, states that he had
the branch wired off, as he did not care to let the cattle drink
from it, and that the odor from the branch was very offen-
sive.   He also stated that the presence of the tank so
affected the water that his cattle would not drink it; and,
further, in his testimony, he states that this branch has been
a foul one for about twenty-five years, and ever since Win-
throp College sewage and the dye stuff was emptied into it,
but that he could see no sewage matter in the stream.

I have thus stated the testimony of the plaintiffs fully for
the reason that this covers practically all of the testimony
for the plaintiffs, touching upon the foulness or pollution
of the stream.

As against this testimony, the defendant offered many
witnesses.   The testimony of the witnesses, Barnwell, Dr.
Fennell and Ludlow, these three witnesses qualified as
experts, and the substance of their testimony was to the
effect that the installation of the septic tank bettered the
condition of the stream below it.   Without reviewing the
testimony of the witnesses by name, it was shown that an
area comprising from one-fourth to one-third of the city of
Rock Hill was drained into this branch.   Three cotton mills
are within its drainage area, and many of these mills still
maintain open closets, and one emptied its dye water into
the stream prior to the installation of the sewerage system.
The testimony is too lengthy to review it in detail, but from

all the testimony I am convinced that the stream has not been polluted by the erection of the septic tank, but, on the contrary, if there has been any change in its condition it has been for the better.

I, therefore, find as a matter of fact that the stream has not been polluted by reason of the city erecting and using this septic tank.

· The next question, that of odors, is more difficult. Many witnesses, who were absolutely reliable, testified that there are pronounced odors arising from the septic tank and branch. Others equally as reliable testified to the contrary. The city went into the defenses fully and presented very strong testimony. The testimony of Messrs. Barnwell and Ludlow both convince me that the city has spared no expense, and has used all modern and scientific methods to purify its sewage, and that the septic tank in controversy is of the most modern design, and is properly constructed and operated. From the testimony of Mr. Barnwell, it will be seen that for a time the tank was not properly operated, and during this time, particularly, the odors were extremely offensive; but, owing to a correction of the volume of sewage handled, through this tank, this defect was overcome. Witnesses visited the tank for the special purpose of ascertaining if there were odors, and practically all of these witnesses testified that there was no odor other than that arising from the use of dyestuff and dye water, which was emptied into the septic tank. The testimony of Mr. Ludlow indicates the chemical action taking place in the tank is designed to purify the sewage, and would have no effect upon the odor in dye water, nor would it rob it of its color.

On the other hand, witnesses of equal integrity, including the plaintiffs, testified that the odors arising from the tank were offensive in the extreme. The testimony of the witnesses of plaintiffs and defendant can only be reconciled by the assumption that at times there are odors and offensive odors, while at other times there are no odors. This might

or might not be due to the condition of the tank, the manner of its operation, or the state of the temperature. In fact, some of the witnesses testified that the odors were more offensive during the morning and night. It will be idle to attempt to review the testimony witness by witness, in more than one hundred pages of testimony taken in the reference. I am convinced from the testimony, and so find, that there are foul and noxious odors arising from the septic tank owned and maintained by the defendant, and these odors are of such an extreme nature as to pollute and contaminate the air in and around the premises of the plaintiffs and interfere with their proper enjoyment and use of their homes and lands, and that the lands of the plaintiffs are thereby reduced in value to plaintiffs' damage, and I so find and recommend.

As to the law of the case, I think it has been settled by the suit of *Parish v. The Town of Yorkville,* reported in 96 S. C., at page 24. This case held that when the right to institute condemnation proceedings is contested:

"The proper remedy is to bring an action in the Court of Common Pleas in order that the Court may in the exercise of its chancery powers determine such right."

See, also, *Railway v. Ridlehuber,* 38 S. C. 308, and other cases cited in the Parish case.

This being the law, the referee is limited in his findings merely as to the question of whether or not the plaintiffs are entitled to any damages, but is without authority to find or even suggest the *quantum.* I have previously stated that I do not think the plaintiffs are entitled to any damages for the pollution of the stream, but am of the opinion that they are entitled to damages by reason of the odors created by the defendant's septic tank.

The referee also takes this occasion to commend counsel for both plaintiffs and defendant for the thorough manner in which they developed the testimony in the case and for the assistance given to the referee.

*Messrs. Dunlap & Dunlap, J. Harry Foster* and *Thos. F. McDow,* for appellants.   *Mr. Foster* cites: *As to the rule that where referee and Circuit Judge differ as to their conclusions on a question of fact, in a chancery case:* 44 S. C. 438; 16 S. C. 469.   *The rule that the Circuit Judge is prima facie right must fade away when the referee is an attorney of sound sense and experience, and above all this, when the referee was present, asked many questions himself, heard the witnesses testify, knows them personally, and is thoroughly familiar with the entire situation.   As to positive and negative testimony:* 90 S. E. Rep. 683; 172 N. C. 853; 105 S. C. 130; Moore on Facts, pp. 365-6, 368; 33 S. W. Rep. 680; Elliott on Evidence, 3216; Elliott on Evidence, sec. 969; 56 Am. Rep. 263; 56 Am. Dec. 68.   *As to city being without power to authorize nuisance:* Dillon on Municipal Corp., sec. 660; 73 S. C. 234.   *As to error in the Court allowing its judgment to be influenced by the assumption that the lands of plaintiffs have been greatly increased in value by the proximity of the city of Rock Hill:* Civil Code of 1912, vol. I, sec. 3034; 50 S. C. 405.   *As to findings beyond the pleadings, evidence and arguments:* Sec. 3053, Code of 1912; 54 S. C. 408; 27 S. C. 272.   *As to the basis on which much of the testimony used in this case may be reconciled:* 96 S. C. 29.

*Messrs. Spencer, Spencer & White,* for respondent, submit: *Injuries not directly—not necessarily or naturally— arising out of the taking are not within the purview of our condemnation laws:* Code of 1912, sec. 3023; State Constitution, art. I, sec. 17; XV Cyc. 655; 53 S. C. 575; (Ala.) 60 A. R. 113; (N. Y.) 53 A. D. 357; 2 Dillon Mun. Corp., sec. 990.   *A reasonable use of the stream by a riparian owner is not a taking under our condemnation laws:* 93 S. C. 422.   *The municipal tort act has no application here:* Acts of 1892, 91; G. S. 1893, sec. 1582; Stat. XXII, 502; R. S. 1902, sec. 2032; Stat. XXIII, 964 (made the only statutory

law); 75 S. C. 597, 1902 (the only statutory law); 43 S. C. 402; 58 S. C. 413; 66 S. C. 442; 70 S. C. 137; 89 S. C. 511; 104 S. C. 371; 106 S. C. 255; Act of December 24, 1892 (XXI, p. 91).

August 25, 1919.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The following statement appears in the record:

"These four suits involve the same issues, and were heard together. These suits were commenced May 21, 1917. The plaintiffs bring suit to recover compensation against city of Rock Hill, S. C., for alleged polluting of Watson's Branch, a small stream heading in the city, and running through the lands of the plaintiff; and compensation is also demanded by reason of alleged foul odors being emitted from a septic tank, or the sewerage system installed by the city just near Watson's Branch. It is alleged that these foul odors make undesirable the homes of the plaintiffs, and also damage the value of their lands.

"By consent the issue as to whether the plaintiffs were entitled to compensation was referred to Hon. John R. Hart, as a special referee. A reference was begun in January, 1918, and by divers continuances concluded some time in May, 1918. The referee found that the stream was not polluted from the operation of the sewerage system, but found that the plaintiffs were entitled to compensation by reason of the foul odors emitted from this septic tank, or the sewerage system.

"Exceptions were taken by each side to the report of the referee, and the matter came on for trial before his Honor, Judge R. W. Memminger, at the December, 1918, term of Court for York county, and the Court affirmed the finding of the referee that there was no additional pollution of the stream, and reversed the referee in his finding that the plain-

tiffs were entitled to compensation on account of odors, and dismissed the complaints. In due time a notice of intention to appeal was served in each of the four cases."

The referee's report will be incorporated.

B. M. Sturgis testified as follows:

"I am one of the plaintiffs. I own 84 acres of land near this septic tank, through which a creek passes running from it. One way the stream is affected by this tank is by the odor. My house is 210 yards from this branch, and about 1,500 yards from the septic tank. * * * This stream also receives the dyestuff. I know that the dyestuff comes down along with the effluent from the tank. I do not know whether the odor comes from the tank or from the dye. I could not tell whether it is sewage or not. The stream rises back of Neely's stable, in Rock Hill. The septic tank has been there about six or seven years. I did not make the complaint until this year.

"Q. Do you claim that the condition of the tank affects the farming of your land? A. So far as the crops are concerned the septic tank does not affect them, but it is very unpleasant to live there. The stream is used by Winthrop College. It has been used since 1894 for putting dyestuff from the mills and other matter. I can't tell exactly how many years. The Winthrop College tank was about the same place where the city tank is now located. My property is not the nearest to the septic tank. This stream is not the only one that runs through my plantation. * * * There is another stream that runs into Watson's Branch right at the tank."

W. S. Sturgis, another plaintiff, testified:

"I own about 135 acres. The stream runs through my place about 500 or 600 yards. My home is about 600 or 800 yards from this branch, and between 1,200 and 1,500 yards from the septic tank.

"Q. Is there anything in the conditions around your place to affect your crops? A. I cannot say that it affects my

crops.   Q. Do you think it would affect the value of your land any?   A. I cannot say as to its affecting its value."

E. W. Sturgis, another plaintiff, testified:

"The effluent from the old Winthrop College sewage settled on my sand beds.   The dye water came down the branch also, but there was not as much there.   Q. Has this branch always been a fouled one?   A. For about 25 years. Since Winthrop College sewage has been put in there.   The matter that comes out of the tank is liquid, and you cannot see any sewage in it.   So far as farming is concerned, the tank has not affected my place, but it is undesirable because of the bad odor."

N. C. Walker testified:

"I live in Rock Hill, and am an architect and engineer, and was living here when the sewerage plant was installed. I worked with Mr. Cothran on his preliminary plans of the system.   Mr. Cothran was the engineer employed by the public service commission, and Herring and Gregory at that time were supposed to be about the best consulting sanitary engineers in the country, and they were employed by the commission, at Mr. Cothran's request, to act as consulting engineers.   Mr. Cothran and I first made a survey, in which we went over the territory, and after making the topographical maps we decided on the approximate location of the disposal plant, and later on ran the actual survey following the natural drainage of the disposal plant site.   I understand Exhibit B, the maps made by Mr. Miller, showing several branches that form Watson's Branch, and the location of the business houses along Main street, the stables and other houses along the branches, and the mills and industrial enterprises.   I also understand that portion of Rock Hill, as indicated on the map, which drains itself into the branch. * * * It is my opinion that one-third of the inhabitants of Rock Hill live within the area which drains into Watson's Branch.   This section includes a whole group of tenant negro houses, several mill villages, besides one of

the best residential sections. One wing of the branch runs back to Neely's livery stable, on Black street, and another runs from Winthrop College and the Wymojo Mill. There are four branches which join and go right into the septic tank. I was familiar with all the branches before the installation of the plant, as I surveyed along all of them. We followed one wing from Black street through the Arcade Mill to the conflux. At that time it was one of the worst branches I ever saw. It passed through the negro settlement. The washerwomen all emptied their washing water into the branch, and all the back yards and surface closet washing went right into this branch. The arm of the branch from the Carhartt Mill, after passing through the mill village, goes through the old fertilizer yard, then right under the old laundry, then under Main street and through a negro settlement, as filthy a section as I ever saw. We had to be careful to keep our tape line from touching the water, as it was filthy. The Carhartt and Victoria Mills were putting their dye water and the Arcade its sizing water into the branches."

J. G. Barnwell testified:

"I am employed as city manager of Rock Hill, S. C. I came to Rock Hill in 1912. The Imhoff System was installed and completed three months after I came to Rock Hill. I have had charge ever since it was installed and turned over to me. I have been in charge as engineer of sewerage and water plants for the last 12 or 15 years here, in York, and in Columbia. The Imhoff tanks were installed at Rock Hill with Mr. Cothran as engineer for the commission, and with Herring & Gregory, sanitary experts and engineers of repute. I heard Mr. Miller testify this morning, and, while I have never attempted to take a census of the area around by Watson's Branch, the housing facilities of that locality are near together, and the population dense, and I would say that area includes probably one-third of the population of Rock Hill. I have personally followed

both prongs of Watson's Branch, which join about the Arcade plant, the entire way to their sources.  One prong of Watson's Branch begins about the Carhartt Mills, passing between the laundry and Pepsi-Cola building, and goes across Black street, and on through the Victoria Mill village, and on to the Arcade Cotton Mill, where it joins the other prong that heads up at Winthrop.  Another prong made in the very heart of Rock Hill.  All the street washings from the pavements, horse droppings, and any surface draining that does not go into the sanitary system, goes into the branch from that wing.  The Hamilton, Carhartt, Victoria, Arcade and Wymojo Cotton Mills, the Rock Hill Buggy Company, a dense negro settlement included, I should say 50 per cent. of all of them are situated within the area which drains itself into Watson's Branch.

"Q. Will you just explain to the Court whereabout this Imhoff tank is and the character of the treatment of the sewage in this system?  A. Dr. Carl Imhoff, of Germany, was the inventor of this tank, and Herring & Gregory obtained the patent rights in this country.  Describing the tank as we have it here, it consists of a unit composed of two basins, each basin being divided into two compartments. These compartments are one above the other, and are known as a two-story tank.  The upper compartment is known as the settling chamber; the lower compartment as the sludge-digesting chamber.  The Imhoff tank is only a part of the purification works at the Arcade disposal plant, and this tank is further supplemented by sludge-drying beds, an automatic flush tank, and a sprinkler filter.  Raw sewage enters first the settling compartments of the Imhoff tank.  These tanks perform their function, and the liquids pass from the tank to the flush tank; from the flush tank they are conveyed by means of cast-iron lines to the spray nozzles, located on the sprinkler filter.  The sewage is sprayed into the air from these nozzles and falls on the crushed stone filter.  Through this filter the liquids percolate and are collected on the bot-

tom in troughs and laterals, which collect the liquids, and convey them to the Watson Branch, where they are finally disposed of into the stream. The treatment of the raw sewage at these works is as follows: Raw sewage enters the settlement compartments, which, as described, are located above the sludge-digesting chamber. The solids are settled out in this chamber, and fall through a longitudinal opening at the bottom of this chamber into the sludge-digesting chamber. The liquid passes out of this settling chamber and is collected into a 3,000-gallon automatic flush tank. When this tank is full it empties its contents through a spray nozzle system into the sprinkler filter. The process of purification at this point is the creation of the liquid which replenishes its lost oxygen. This replacement of oxygen is accomplished in two ways: First, the spraying of the liquid into the air; and, second, the air collected as it percolates through the well-ventilated crushed stone filters. The organic matter in the sewage is further attacked in the sprinkler by means of the aerobic bacteria, which live and are fed by the organic matter in the sewage. Two agencies are constantly at work at this point purifying the sewage—aerobic bacteria and oxygen. As previously described, the solids are settled out into the sludge-digesting chamber. The action taking place in this chamber on the organic solids settled therein is continuous. This destructive action is brought about by the presence of millions of purifying or anaerobic bacteria. These bacteria attack the solids settled therein and reduce it to a stage of complete decomposition. When the proper amount of decomposition has set in, or the sludge is 'ripe,' valves are opened, and the ripe sludge is allowed to pour out on the two sludge-drying beds. The sludge is allowed to stand on this bed until it is dry, and is then loaded with a shovel and spade, and carried with a wheelbarrow and deposited on the soil. The biological action on this organic matter has been so complete in the sludge-digesting chamber as to destroy even the fertilizer

value of the organic matter, and it seems turned back to dust. The underlying principle of the treatment of raw sewage and organic matter present might be explained in the phrase, 'Dust we are, and to dust returneth.' The basic principle of the treatment is to accomplish this purpose."

J. L. Ludlow testified:

"I live at Winston-Salem, N. C., and am a civil and sanitary engineer. I am the engineer member of the board of health of North Carolina, and I am at present supervising engineer of construction for the government at Camp Greene, Charlotte. I have had quite a lot of experience in sewerage and sanitary work in South Carolina. I designed and built the sewerage system for Columbia, Union, Laurens and Spartanburg, and designed the sewerage system for Charleston. I am familiar with the several maps testified about by Mr. Miller and placed in evidence, and I am familiar with, and have inspected, the Imhoff tank, concerning which these suits have been brought. I have seen the branch into which the effluent flows. That branch would be foul by nature on account of its origin and source in the confines of the town. Q. Mr. Ludlow, you made a careful inspection and physical examination of the plant and saw it operating. Will you state what sort of plant it is, and whether it is functioning properly? A. I found the plant to be in very good condition, functioning very well, indeed, and performing as well as could be expected by most any plant. I have inspected a large number of other plants at other places. I think there would be no question but that the sewage collected and treated as it is at one point and discharged into the stream puts the stream below in better condition than it would be in the absence of the system and sewage treatment. I express this opinion with the assistance of the maps with reference to the natural drainage, and also from my observation of the surroundings and visit to the plant, and my knowledge of the improved condition that always follows the collection of sewage filth in any commu-

32—112

nity, and the proper treatment at one point. · The smells at this plant are very slight. Could hardly detect them at all. · Had to go right down close to the tank and close to the place where the sprinklers operate, and near where the effluent enters the branch, to get any odor. Odors such as were there today would not go under any condition for a distance of 50 or 100 feet. I should not think they could possibly go over 200 yards. Untreated sewage proceeds a long way. The odors from a polluted, foul branch would travel farther, for the reason that decomposition taking place in a branch filling the air, while decomposition in Imhoff tank is buried under a mass of liquid, and is sealed away from the air. Where allowed to accumulate, as is usually the case, any ordinary rain would wash a considerable amount of organic matter down into the branch. I think the offensive odors from the dyestuff would be reduced to a slight extent by putting it through the tank. The odors from dyestuffs do not make any one sick, and are not deleterious to health, and do not cause disease. The records show that people working on big sewers of Paris are about the healthiest group of citizens of the city."

It is only necessary to refer to the foregoing testimony to show that the exceptions assigning error on the part of his Honor, the Circuit Judge, in his findings of fact that the plaintiff was not entitled to damages for the alleged pollution of the stream, cannot be sustained.

We proceed to the consideration of the second question, to wit, Was there error on the part of his Honor, the Circuit Judge, in his findings of fact that the plaintiff is not entitled to damages on account of the foul smells and noxious odors arising from the installation of the defendant's sewerage system?

The lands of the plaintiff do not adjoin the lands upon which the septic tank is located. His residence is about 1,500 yards from the septic tank, but is much nearer Watson's Branch, which runs through his lands. The testi-

mony shows that said stream was very foul for many years prior to the installation of the septic tank. The foulness of the stream had the natural effect·of generating odors and poisoning the atmosphere. The only reasonable inference from the testimony is that the purification of the stream necessarily had the effect of making the atmosphere more wholesome and the odors less noxious.

The exceptions raising this question are also overruled. Affirmed.

MESSRS. JUSTICES HYDRICK, WATTS and GAGE concur.

MR. JUSTICE FRASER did not sit.